**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

THANH TAM NGUYEN and MDA LLC,

                    Plaintiffs,

v.

CLARENCE WILLIAM RAMSEY III; SHYROCK
MCA HOLDING, LLC; CALHOUN REALTY
COMPANY d/b/a CALHOUN COMPANIES;
MANOJ MOORJANI; and BRENT JOSEPH
JOHNSON,

                    Defendants.

Civil No. 25-1750 (JRT/JFD)

**ORDER GRANTING IN PART AND
DENYING IN PART RAMSEY AND
SHYROCK MCA HOLDING, LLC'S MOTION
TO DISMISS**

---

Andrew T. James and Casey D. Marshall, **BASSFORD REMELE PA**, 100 South Fifth Street, Suite 1500, Minneapolis, MN 55402, for Plaintiffs.

Paul W. Chamberlain, **CHAMBERLAIN LAW FIRM, PLLC**, 1907 Wayzata Boulevard, Suite 130, Wayzata, MN 55391, for Defendants Clarence William Ramsey III and Shyrock MCA Holding, LLC.

Peter M. Waldeck, **WALDECK LAW FIRM P.A.**, 900 Second Avenue South, Suite 1575, Minneapolis, MN 55402, for Defendants Calhoun Realty Company d/b/a Calhoun Companies and Manoj Moorjani.

Brent Joseph Johnson, 3312 Pillsbury Avenue South, Apartment 202, Minneapolis, MN 55408, *pro se* Defendant.

This case arises out of a dispute over the sale of a business, in which the purchasers allege violations under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), wire fraud, fraudulent misrepresentation, negligent misrepresentation, breach of contract, and other related state law claims. Defendants Clarence Ramsey and Shyrock

MCA Holding, LLC (collectively, the "Shyrock Defendants") move to dismiss the RICO and wire fraud claims with prejudice under Federal Rules of Civil Procedure 9(b) and 12(b)(6) and seek dismissal of the remaining state law claims without prejudice under Rule 12(b)(1) for lack of subject matter jurisdiction.

The Court will grant the Shyrock Defendants' motion in part and deny it in part. Because the Court will find that Plaintiffs have plausibly alleged their RICO claim with particularity and the Court has jurisdiction over Plaintiffs' state law claims, the Court will deny the Shyrock Defendants' motion to dismiss as to these claims. The Court will dismiss the wire fraud claim with prejudice to the extent the Plaintiffs assert it as a standalone cause of action because the Eighth Circuit does not recognize civil wire fraud as an independent cause of action.

**BACKGROUND**

I.    **FACTUAL BACKGROUND**

A.    **The Shyrock Defendants Purchase Mill City**

Liz Kingstedt, a licensed certified registered nurse anesthetist ("CRNA"), founded Mill City Anesthesia LLC ("Mill City") in 2019. (Compl. ¶¶ 1, 25, April 28, 2025, Docket No. 1.) Her spouse, Ryan Kingstedt, later joined as a co-owner. (*Id.* ¶ 25.) Mill City contracts with CRNAs and other qualified professionals to provide on-site dental anesthesia services. (*Id*. ¶ 1.) Liz recruited CRNAs from her professional network to join Mill City as contractors. (*Id*. ¶ 25.) Mill City's profits grew under the Kingstedts, but in 2024, the Kingstedts decided to sell the business. (*Id*. ¶¶ 26, 27.) The Kingstedts engaged Calhoun Companies

2

("Calhoun"), a brokerage company, to assist with the sale.  (*Id.* ¶ 27.)  Calhoun assigned one of its brokers, Manoj Moorjani, (collectively, "the Calhoun Defendants") to search for a buyer.  (*Id*. ¶ 27.)  Moorjani introduced Clarence Ramsey to the Kingstedts as a potential buyer.  (*Id*. ¶ 28.)

Ramsey and Moorjani have worked together on dozens of transactions over the past 20 years.  (*Id.* ¶ 28.)  In "at least one" other transaction involving Moorjani and Ramsey, litigation arose over allegations that one party failed to disclose material information—such as ongoing litigation—during sale negotiations. (*Id*.)  Ramsey does not have any medical licensure, relevant education, or experience.  (*Id.* ¶ 29.) Despite Ramsey's lack of experience, Ramsey acquired Mill City in May of 2024 through his company, Shyrock MCA Holding, LLC ("Shyrock").  (*Id*. ¶¶ 2, 30.)

Plaintiffs allege that after taking over the company, Ramsey neglected the business, eroding its value.  (*Id*. ¶¶ 3, 31.)  Mill City's previous business model relied upon on a stable workforce of contract CRNAs to dispatch to its primary clientele: pediatric-dental clinics.  (*Id*. ¶ 32.)  These clinics mandate or strongly prefer two CRNAs on site for any pediatric-anesthesia procedures to ensure patient safety.  (*Id*.)  To support this business model—Liz, the prior owner—would serve as the second CRNA if needed.  (*Id*. ¶ 33.)  In addition, Liz would recruit and retain CRNAs through her personal and professional relationships.  (*Id*.)

Liz agreed to continue as a contract CRNA for Mill City during the initial period of Ramsey's ownership. (*Id*. ¶ 34.) However, the Shyrock Defendants failed to pay Liz for her services in October and November of 2024. (*Id*.) The Kingstedts informed Calhoun that Liz was owed $12,000 and would stop working as a CRNA if she did not receive payment. (*Id*.) Calhoun, through Moorjani, responded by requesting that Liz continue working without pay until the business was sold, promising she would be compensated from the proceeds of the sale. (*Id*.) Liz refused and brought an action against Ramsey in Minnesota state court for failure to pay on December 2, 2024. (*Id*.) *See Elizabeth Kingstedt, Ryan Kingstedt v. Clarence William Ramsey d/b/a Mill City Anesthesia, LLC*, Court File No. 27-CO-24-11623.

Similarly, Ramsey failed to pay the other contracted CRNAs, including the last CRNA working for Mill City, Christine. (*Id.* ¶ 36.) Christine was not comfortable serving pediatric-anesthesia cases on her own, and she communicated that feeling numerous times to Ramsey. (*Id*. ¶ 37.) After Ramsey failed to pay Christine on time, she significantly reduced her work with Mill City, leaving the company without any consistent CRNAs. (*Id*.) Ramsey also failed to pay vendors. (*Id*. ¶ 38.) Without consistent CRNAs and vendors, Mill City's clients stopped doing business with Mill City, thereby leaving Mill City in a vulnerable financial position. (*Id*. ¶¶ 37–39.)

Ramsey contacted Calhoun in October of 2024 to sell Mill City. (*Id*. ¶ 39.) Calhoun and Moorjani knew that Mill City's financial condition was deteriorating and

communicated to third parties "that the company would fail if it was not quickly sold." (*Id*. ¶ 40.) Calhoun and Moorjani continued to pursue the sale, claiming that the company's seller discretionary earnings ("SDE") were $199,000 even though the true SDE was lower. (*Id*. ¶ 41.)

### B.    The Shyrock Defendants Sell Mill City to Plaintiffs

In November 2024, Ramsey began discussions to sell Mill City to MDA LLC ("MDA") through its president, Thanh Tam Nguyen ("Tam") (collectively, "Plaintiffs"). (*Id*. ¶¶ 5, 42.) During these discussions, Tam communicated that she only wanted to purchase a business with established customers and clients. (*Id*. ¶ 43.) Ramsey responded that he did not work more than 40 hours each week and that he believed he could operate Mill City in only 20 hours per week. (*Id*.)

To further encourage Tam to purchase Mill City, on November 8, 2024, Calhoun shared a document detailing the financial and operational state of the business (the "Calhoun Report"), which created the "false impression that Mill City's financial condition was stable and growing." (*Id*. ¶ 44.) The Calhoun Report claimed the following: (1) Mill City's revenue was $739,350, and its adjusted profit was $297,953; (2) Mill City boasts "[a] team of skilled medical providers who are all experienced in pediatric care"; (3) Ramsey "works 35 hours a week on scheduling, inventory management, [accounts receivable/payable], and stakeholder communications"; (4) Mill City had "15 medical provider contractors," consisting of 7 CRNAs and 8 registered nurses; (5) Mill city had "[r]epeat revenue from customer base with strong margins"; (6) Mill City was projected

to enjoy approximately $80,000 in monthly sales in March 2025, increasing to approximately $120,000 in monthly sales by January 2026; and (7) the Calhoun Report listed Mill City's sales through October 2024, even though Defendants knew that Mill City would likely lose substantial business in the coming months. (*Id*.) Plaintiffs contend that the Calhoun Report's description of the state of Mill City's business was "materially misleading," "fictional," and "false." (*Id*.)

On November 21, 2024, Calhoun and Moorjani gave Tam a balance sheet through October 31, 2024 that reflected nominal short-term liabilities for Mill City. (*Id*. ¶ 45.) The balance sheet omitted missed payments to Mill City's contractors, including Liz, who claimed $12,000 in unpaid services in her December 2, 2025, lawsuit against Ramsey. (*Id*.) The Complaint claims that the omitted liabilities amounted to at least $15,000. (*Id*.)

On November 24, 2024, based on the representations in the Calhoun Report, Tam executed a letter of intent to purchase Mill City for $850,000. (*Id*. ¶ 46.) Plaintiffs made a $10,000 initial payment to Calhoun and Moorjani. (*Id*.) After signing the letter of intent, Defendants continued to provide updates, which Plaintiffs allege were false, on the status of the business. (*Id*. ¶ 47.) On December 2, 2024, Ramsey told Tam that Christine was taking a leadership role when in fact, Christine had told Ramsey that she would be leaving Mill City in March 2025. (*Id*.) Ramsey had also told Tam that he had hired a new CRNA, but in reality, that CRNA had only agreed to shadow for a single shift. (*Id*.) Plaintiffs

further allege that the new CRNA did not return because Ramsey failed to timely pay her. (*Id.*)

On December 4, Tam asked Defendants to disclose the purchase price of Ramsey's acquisition of Mill City earlier that year. (*Id*. ¶ 48.) Defendants refused. (*Id*.) On December 13, Tam expressed concern to Ramsey about the low number of cases Mill City handled in December. (*Id*. ¶ 49.) Ramsey responded that Mill City's business was "'seasonal' and that sometimes the future schedules for individual patients [did] not populate into the scheduling calendar until a week or two before the procedure." (*Id.*)

On December 17, Ramsey told Tam that he expected Mill City's SDE would likely be "just about $300k." (*Id*. ¶ 50.) Two days later, Tam inquired whether there had been any changes in business conditions that Ramsey felt she should be aware of. (*Id*. ¶ 51.) But Ramsey did not disclose Mill City's serious financial issues, the various CRNA departures, Christine's decision to leave in March 2025, or the decrease in cases. (*Id*. ¶ 51.) On December 26, 2024, Ramsey made the following claim to underwriters:

> Mill City Anesthesia has a very strong referral network, where a majority of our new clients in 2024 are from referrals from other dental clinics. We also have a good web presence and receive referrals to our website from google driven searches. Rapid growth in revenue[,] [v]ery strong demand in a growing industry, with increased demand forecasted to continue. Small to mid-sized dental offices are able to retain current challenging clients and increase their daily patient count when using our service.

(*Id*. ¶ 52.) Within the same week, on December 30, Ramsey provided Plaintiffs' lender with a list of Mill City's independent contractors. (*Id*. ¶ 53.) Many of these contractors

no longer worked for Mill City. (*Id*.) Others had worked at Mill City previously but either showed no intention of returning or stated they would not return. (*Id.*) On January 10, 2025, Tam asked Ramsey by email whether any current or past lawsuits involved Mill City. (*Id*. ¶ 54.) He responded that no such lawsuits existed, which Plaintiffs allege was false, given the Kingstedts' pending action for unpaid services. (*Id*.) Plaintiffs state that if Tam had known about this matter, the lack of CRNAs, and Mill City's financial condition, she would not have moved forward with the purchase. (*Id*.)

During these negotiations Ramsey engaged Defendant Brent Joseph Johnson to prepare a Certified Financial Statement for Mill City related to the company's financial operations in 2024. (*Id*. ¶¶ 7, 55.) Plaintiffs were unaware that Johnson had worked for Ramsey previously and that Johnson's CPA license had been revoked in 2010. (*Id*. ¶ 55.) The Certified Financial Statement contained false and misleading information, and it omitted information regarding Mill City's total income, gross profit, payroll expenses, total expenses, net operating income, and net income. (*Id.*) Relying on the information provided to her from the Defendants, Tam signed the Asset Purchase Agreement to purchase Mill City for $850,000 on January 17, 2025. (*Id*. ¶¶ 8, 56.)

In late January or early February, Tam met with Ramsey and Moorjani. (*Id*. ¶ 57.) During the conversation, Ramsey told Tam that cases were being rescheduled for February and could be as high as fifty in that month. (*Id*.) Tam later learned that Mill City handled only fifteen cases in February. (*Id*.) Plaintiffs allege that "Calhoun and Moorjani

knew the number of cases at Mill City as of this time, knew that Ramsey's statement to Tam was false, and they failed to correct it." (*Id*.)

The parties closed the sale on February 21, 2025. (*Id*. ¶ 58.) Plaintiffs' lender, which was located in Missouri, made wire-transfer payments, including: (1) $312,980.60 to the Shyrock Defendants' bank in Bloomington, Minnesota to pay off a loan; (2) $65,000 to Calhoun in Minnesota as a commission fee; (3) $375,479.40 to the Shyrock Defendants in Minnesota as seller proceeds; and (4) $1,540 to the Minnesota law firm that facilitated the closing. (*Id*.)

### C.    Post-Closing Events

After taking over the business, Tam learned new information about Mill City from employees and company documents. (*Id*. ¶ 59.) Tam learned that Mill City's December, January, and February revenues were lower than previous years; that Ramsey rarely came into the office and neglected administrative work; and that Mill City did not have sufficient CRNAs to staff pediatric-dental-clinic customers, which constituted 70 percent of its business. (*Id*.) Tam also learned that Christine, the final remaining CRNA, would be leaving the company effective immediately, leaving Mill City with no other CRNAs, despite multiple people encouraging Ramsey to hire more CRNAs. (*Id*.) Tam learned that Mill City had lost three of its biggest customers by February, totaling about 65 percent of its revenue, and that the business's caseload had dropped from the 30 to 50 cases per month under the Kingstedts' ownership, to only eight cases scheduled for March 2025, and five for April 2025. (*Id*.) Finally, Tam learned that Ramsey had not been timely paying many

contractors and vendors and that the Kingstedts had sued Ramsey and the company. (*Id*.)
These facts left Tam unsure about whether Mill City would remain solvent. (*Id*. ¶ 61.)

Plaintiffs further allege that even though the sale closed in February 2025, the
Shyrock Defendants continue to improperly control Mill City's assets. (*Id.* ¶ 10.) Tam has
not gained full access to Mill City's Microsoft accounts despite repeated requests for login
information. (*Id*.) Plaintiffs also allege that the Shyrock Defendants wrongfully retained
revenue payments dated February 21 and 24, 2024. (*Id*.)

## II.    PROCEDURAL BACKROUND

Plaintiffs filed their Complaint on April 28, 2025, alleging 14 causes of action across
five defendants: Ramsey, Shyrock, Calhoun, Moorjani, and Johnson. (Docket No. 1.) The
Complaint asserts claims under the RICO Act, 18 U.S.C. §§ 1961, *et seq*., and 18 U.S.C. §
1343 (wire fraud) as well as other state law causes of action generally grounded in fraud
and breach of contract. (Compl. ¶ 5.) The Shyrock Defendants moved to dismiss the
Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6) and 9(b). (Mot.
to Dismiss, May 21, 2025, Docket No. 14.) They argue that the Plaintiffs' RICO and wire
fraud claims fail to state a claim under Rule 12(b)(6) and are not pleaded with particularity
under Rule 9(b). (Defs.' Mem. Supp. Mot. Dismiss at 1–3, May 21, 2025, Docket No. 15.)
They further argue that if the Court dismisses the RICO and wire fraud claims, the Court
should decline to exercise supplemental jurisdiction over Plaintiffs' remaining state law
claims. (*Id.* at 25.)

## DISCUSSION

### I.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) permits a defendant to file a motion to dismiss for lack of subject-matter jurisdiction.   In determining whether jurisdiction exists, the Court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Osborn v. United States,* 918 F.2d 724, 730 (8th Cir. 1990).  It is the plaintiff's burden to establish that jurisdiction does in fact exist.  *Id.*  If the motion to dismiss under Rule 12(b)(1) is based on a deficiency in the pleadings, the "standard of review is the same standard we apply in Rule 12(b)(6) cases."  *Stalley v. Catholic Health Initiatives,* 509 F.3d 517, 521 (8th Cir. 2007).  If the Court finds that jurisdiction is not present, it must dismiss the matter.  Fed. R. Civ. P. 12(h)(3).

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the Complaint as true to determine if the Complaint states a "claim to relief that is plausible on its face." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  The Court construes the Complaint in the light most favorable to the plaintiff, drawing all reasonable inferences in the plaintiff's favor.  *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009).  Although the Court accepts the Complaint's factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), or mere "labels and conclusions or a formulaic recitation of the elements of a cause of action," *Iqbal*, 556 U.S. at 678 (quotation omitted).

11

Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

At the motion to dismiss stage, the Court may consider the allegations in the Complaint as well as "those materials that are necessarily embraced by the pleadings." *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014). The Court may also consider matters of public record and exhibits attached to the pleadings, as long as those documents do not conflict with the Complaint. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

## II.    FEDERAL CLAIMS

### A.    COUNT I: RICO

The RICO Act makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Despite this broad language, "RICO 'does not cover all instances of wrongdoing. Rather, it is a unique cause of action that is concerned with eradicating organized, long-term habitual criminal activity.'" *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011) (quoting *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006)).

12

To plausibly allege a civil RICO claim, Plaintiffs must establish four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *H & Q Props., Inc. v. Doll*, 793 F.3d 852, 856 (8th Cir. 2015) (quoting *Nitro Distrib. Inc. v. Alticor, Inc.*, 565 F.3d 417, 428 (8th Cir. 2009)).  Plaintiffs must plead each element with respect to each Defendant.  *Craig Outdoor Advert. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1027 (8th Cir. 2008).

RICO claims are subject to Fed. R. Civ. P. 9(b)'s heightened pleading standard, which requires the plaintiff to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b); *see also Crest*, 660 F.3d at 353.  Defendants must be able to "respond specifically, at an early stage of the case, to potentially damaging allegations of immoral and criminal conduct."  *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001).  In other words, "the complaint must identify the 'who, what, where, when, and how' of the alleged fraud."  *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006) (quoting *United States ex rel. Costner v. United States*, 317 F.3d 883, 888 (8th Cir. 2003)).

### 1.    Conduct

The "conduct" element of RICO claims "authorize[s] recovery only against individuals who 'participate in the operation or management of the enterprise itself.'"  *Handeen v. Lemaire*, 112 F.3d 1339, 1347 (8th Cir. 1997) (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)).  "An enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the

direction of upper management.  An enterprise also might be 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it as, for example, by bribery."  *Id.* at 1348 (quoting *Reves*, 507 U.S. at 184).

The Court concludes that Plaintiffs' Complaint is sufficient to satisfy the conduct element at the motion to dismiss stage because Plaintiffs plausibly allege that the Shyrock Defendants exercised the requisite direction and control over the alleged enterprise.

Plaintiffs allege the following:  After the Kingstedts sold Mill City to the Shyrock Defendants in May of 2024, Ramsey became responsible for managing Mill City's operations, including, among other things, managing talent and paying contractors and vendors.  (Compl. ¶¶ 30–31, 36–37.)  When Mill City's financial condition deteriorated over the summer and fall of 2024, Calhoun and Shyrock Defendants coordinated to sell the company.  (*Id.* ¶¶ 39–42.)  During the ensuing negotiations, Moorjani and Ramsey made various false and misleading statements and/or omissions in connection with the sale—such as Ramsey providing a false explanation as to the cause of the low December case numbers; Ramsey falsely telling Tam that he expected Mill City's SDE to come in "just about $300k"; and Ramsey failing to disclose that CRNAs were leaving the company or that Christine would be leaving Mill City in March 2025.  (*Id.* ¶¶ 49–51.)  Ramsey also allegedly made false statements to Tam's lender regarding Mill City's financial condition and provided it with a list of Mill City's independent contractors, which included contractors who had either not worked for Mill City for years or worked for Mill City once

14

and did not express any intention to return.  (*Id.* ¶¶ 52–53.)  Ramsey stated, falsely, that there were no current or past lawsuits involving Mill City, when in fact, there was a pending lawsuit against the company for failure to timely pay for services.  (*Id.* ¶ 54.)  Ramsey also hired Defendant Johnson to prepare a Certified Financial Statement for Mill City, which allegedly contained false or misleading information.  (*Id.* ¶ 55.)

These allegations are sufficient at this stage to demonstrate the Shyrock Defendants significant role in directing the alleged scheme.  Plaintiffs therefore have satisfied the "conduct" element.

### 2.   Enterprise

An "enterprise" refers generally to "the vehicle through which the unlawful pattern of racketeering activity is committed."  *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 259 (1994).   RICO defines "enterprise" broadly, to "includ[e] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  Thus, an "enterprise may be an association in fact composed of multiple entities."  *Aragon v. Che Ku*, 277 F. Supp. 3d 1055, 1070–71 (D. Minn. 2017) (citing *Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 995 (8th Cir. 1989)).

An association-in-fact enterprise requires three structural features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. U.S.*, 556 U.S. 938, 946 (2009).  Although an association-in-fact enterprise must have a structure, it does not

need to have a hierarchy, chain of command, regular meetings, membership rules, or other organizational attributes. *Id.* at 948.

The Court concludes that the Complaint adequately alleges an association-in-fact enterprise. Plaintiffs allege that Defendants shared a common purpose of defrauding purchasers and sellers of businesses, including Tam. (Compl. ¶ 64.) In fact, the Complaint alleges that one of Moorjani and Ramsey's previous transactions resulted in litigation involving a claim of a failure to disclose material information. (*Id.* ¶ 28.) Plaintiffs also state that the Defendants had a preexisting relationship with one another. It states that "Moorjani and Ramsey have a lengthy course of dealing," which include "dozens of transactions or more" over the past two decades. (*Id.* ¶ 28.) The Complaint further alleges Defendant Johnson had worked "for Ramsey as a driver and a CPA for another company that Ramsey owned." (*Id.* ¶ 55.)

At this stage in the litigation, the Court concludes that the Complaint plausibly alleges that the Defendants operate as "a continuing unit that functions with a common purpose."[1] *Boyle*, 556 U.S. at 948. Therefore, the enterprise element is satisfied.

---

[1] Before the Supreme Court's *Boyle* decision, the Eighth Circuit required a RICO enterprise to have an "ascertainable structure distinct from that inherent in a pattern of racketeering." *See Handeen*, 112 F.3d at 1351. To meet this requirement, courts asked whether the enterprise would still exist if "the predicate acts [were] removed from the equation." *Id.* at 1352. Since *Boyle*, which clarified that the association-in-fact enterprise must simply have a purpose, relationships, and sufficient longevity, the Eighth Circuit and other courts in this District have cited to the Eighth Circuit's pre-*Boyle* rule. *See, e.g., Crest*, 660 F.3d at 354–55; *Sebrite Agency, Inc. v. Platt*, 884 F. Supp. 2d 912, 920 (D. Minn. 2012). But, as in *Target Corp. v. LCH Pavement Consultants, LLC*, No. 12-1912, 2013 WL 2470148 (D. Minn. June 7, 2013), the Court concludes

### 3.    Pattern

"A pattern is shown through two or more related acts of racketeering activity that 'amount to or pose a threat of continued criminal activity.'"  *Nitro*, 565 F.3d at 428 (quoting *Wisdom v. First Midwest Bank, of Poplar Bluff*, 167 F.3d 402, 406 (8th Cir. 1999). This requirement is frequently referred to as "continuity plus relationship."  *Handeen*, 112 F.3d at 1353 (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).

To establish continuity, Plaintiffs must prove either that the predicate acts took place over an extended period of time (closed-end continuity) or "that the alleged predicate acts threaten to extend into the future (open-ended continuity)." *Craig Outdoor Advert.*, 528 F.3d at 1028.  The Eighth Circuit has held that closed-end continuity "can be shown by related acts continuing over a period of time lasting at least one year." *Crest*, 660 F.3d at 357 (citation omitted).  Open-ended continuity can be shown where the "predicate acts themselves involve a distinct threat of long-term racketeering activity or that the predicate acts constitute a regular way of conducting an ongoing legitimate

---

that the Eighth Circuit in *Crest Construction*, which cited only pre-*Boyle* Eighth Circuit cases, did not intend to preserve the pre-*Boyle* ascertainable structure requirement.  *See Target*, 2013 WL 2470148, at *3 (It was "not reasonable . . . to infer from the inclusion of those [pre-*Boyle*] references [that there was] a considered decision on the part of the Eighth Circuit to deviate from a rule clearly set out by the Supreme Court.").  Accordingly, Plaintiffs must allege only that the enterprise has "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946.

business or a RICO enterprise." *Craig Outdoor Advert.*, 528 F.3d. at 1028 (citing *H.J. Inc.*, 492 U.S. at 242–43).

As for the relationship prong, the predicate acts of wire fraud are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Handeen*, 112 F.3d at 1353 (quoting *H.J. Inc.*, 492 U.S. at 240).

The Court concludes that the Complaint plausibly alleges open-ended continuity and relatedness, but not closed-ended continuity. The Court will address each requirement in turn.

### a.    Open-ended Continuity

The Shyrock Defendants argue that Plaintiffs have failed to plausibly allege any sort of continuous pattern of racketeering activity because at most, the Complaint alleges a single instance of misconduct. (Defs.' Mem. Supp. Mot. Dismiss at 16–17.) In response, Plaintiffs argue that the pattern extends beyond the sale of Mill City to Plaintiffs. (Pls.' Opp. Mem. to Mot. Dismiss ("Pls.' Opp. Mem.") at 30, June 11, 2025, Docket No. 23.) Plaintiffs divide Defendants' conduct into three categories: (1) Defendants' prior course of dealing, (2) pre-sale fraudulent conduct, and (3) post-sale obstruction and concealment. (*Id.* at 30–32.) The Court finds that taken together, the acts alleged in these three categories plausibly allege open-ended continuity.

First, Plaintiffs allege that over the past two decades, Ramsey and Calhoun have a lengthy course of dealing involving numerous transactions, in which Calhoun and Moorjani acted as Ramsey's broker when buying and selling businesses. (Compl. ¶ 28.) One previous transaction resulted in litigation involving a claim that a party failed to disclose material information during sale negotiations. (*Id.*) Defendant Johnson has also served as Ramsey's driver and as a CPA for another company owned by Ramsey. (*Id.* ¶ 55.)

Second, the Complaint alleges that the Shyrock Defendants intentionally ran Mill City into the ground, driven by Ramsey's failure to hire and/or pay contractors and vendors. (*Id.* ¶¶ 33–38.) For instance, in December of 2024, the Kingstedts sued Ramsey for approximately $12,000 in unpaid CRNA services. (*Id.* ¶ 34.) During the negotiations in November 2024, the Calhoun Defendants provided Tam with the Calhoun report and October 2024 balance sheet, which allegedly contained false information. (*Id.* ¶¶ 44–45.) The Complaint also details several other false statements by Ramsey, including statements regarding CRNA staffing, CRNA case numbers, and financial projections. (*Id.* ¶¶ 47–51.) Ramsey made allegedly false misrepresentations to Tam's lender regarding Mill City's financial condition and the number of CRNAs affiliated with Mill City. (*Id.* ¶¶ 52–53.) Ramsey also denied the existence of any current or past lawsuits, despite being named as a defendant in a pending lawsuit with the Kingstedts. (*Id.* ¶ 54.) In

January 2025, Johnson provided Plaintiffs (through their lender) with a Certified Financial Statement, which purportedly contained false or misleading information. (*Id.* ¶ 55.)

Third, the Complaint alleges that the Shyrock Defendants continue to improperly control Mill City's assets after the sale of the company—namely, Mill City's domain and email. (*Id.* ¶ 10.)  Ramsey has refused to provide company usernames and passwords, and the Shyrock Defendants have also wrongfully retained certain February 2025 revenue payments that allegedly belong to Plaintiffs. (*Id.*)

The Court finds that these facts plausibly support a distinct threat of long-term racketeering activity.  The alleged conduct goes beyond a one-time business sale and reflects a broader pattern of defrauding buyers through false statements and material omissions. (*See id.* ¶ 64.)  Because the Complaint plausibly alleges that this pattern of fraud constitutes the regular way in which the Defendants collectively operate, the Court concludes Plaintiffs have sufficiently alleged open-ended continuity. *See H.J. Inc.*, 492 U.S. at 242–43.

### b.    *Closed-ended Continuity*

The Complaint fails to plausibly allege closed-ended continuity.  Even assuming Plaintiffs plausibly allege predicate acts of wire fraud under 18 U.S.C. § 1343, the alleged predicate acts span months, which is insufficient.  *See Primary Care Invs., Seven, Inc. v. PHP Healthcare Corp.*, 986 F.2d 1208, 1215–16 (8th Cir. 1993) (finding activity spanning ten or eleven months to be insufficient).

Here, Plaintiffs argue that Defendants' RICO predicate acts span more than one year—beginning in May 2024 with the purchase of Mill City and continuing through at least June 11, 2025.  (Pls.' Opp. Mem. at 32.)  But the facts presented in the Complaint do not support this timeline.  In May 2024, the Shyrock Defendants purchased Mill City from Kingstedt.  (Compl. ¶ 30.)  The Complaint alleges no fraud or other predicate acts concerning this transaction.  After Calhoun introduced Tam to Ramsey in early November 2024, the Calhoun Report was provided to Plaintiffs.  (*Id.* ¶ 45.)  Johnson then provided the Plaintiffs with the Certified Financial Statement in January 2025.  (*Id.* ¶ 55.)  Finally, based on these oral and written statements, Plaintiffs made four wire-transfer payments at closing in February 2025.  (*Id.* ¶¶ 55, 67.)  The alleged false and misleading statements and omissions therefore were made between November 2024 through February 2025. (*Id.* ¶¶ 47–54.)

Taken together, the Complaint alleges predicate acts spanning a period of four to five months, which is insufficient to allege closed-ended continuity.  *See Crest*, 660 F.3d at 357 (holding that a scheme lasting less than seven months was legally insufficient; *see also Terry A. Lambert Plumbing, Inc. v. W. Sec. Bank*, 934 F.2d 976, 981 (8th Cir. 1991) (concluding that no pattern of racketeering activity existed because "a plan to defraud a single company in connection with a single set of loan agreements . . . . that involves only one victim and takes place over a short period of time" is insufficient).  In fact, the Complaint confirms this timeline as it alleges that "[b]eginning in or about November,

2024, and continuing through at least the closing of the sale of Mill City to Plaintiffs on February 21, 2025, Defendants knowingly and intentionally devised a scheme to defraud Plaintiffs . . . ." (Compl. ¶ 74.) Accordingly, the Complaint fails to allege closed-ended continuity.

### c.    Relatedness

The relatedness element requires the alleged predicate acts to "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Handeen*, 112 F.3d at 1351. The parties do not appear to dispute this element, and the Court concludes that Plaintiffs have sufficiently alleged relatedness. The alleged predicate acts were related—they all were directed toward inducing purchasers, including Plaintiffs to buy Ramsey's businesses. *See Medallion Television Enters., Inc. v. SelecTV of California, Inc.*, 833 F.2d 1360, 1363 (9th Cir. 1987) ("Whether the predicate acts alleged or proven are sufficiently related is seldom at issue . . . .").

Because the Complaint alleges open-ended continuity and relatedness, the Complaint plausibly alleges a "pattern" of racketeering activity.

### 4.    Racketeering Activity

Racketeering activity includes any act that qualifies as a predicate offense under 18 U.S.C. § 1961(1). *UMB Bank, N.A. v. Guerin*, 89 F.4th 1047, 1053 (8th Cir. 2024). The Complaint must allege two predicate acts for each defendant. *Craig Outdoor Advert.*, 528 F.3d at 1027–28. Racketeering activity includes wire fraud. *See Guerin*, 89 F.4th at 1053;

18 U.S.C. §§ 1343, 1961(1).  When pleading wire fraud as a predicate act, the following elements must be shown: "(1) a plan or scheme to defraud, (2) intent to defraud, (3) reasonable foreseeability that the . . . wires will be used, and (4) actual use of the . . . wires to further the scheme."  *Wisdom*, 167 F.3d at 406.  The phrase "scheme to defraud" implies "some degree of planning by the perpetrator, [and] it is essential that the evidence show the defendant entertained an intent to defraud."  *Doll*, 793 F.3d at 856 (alteration in original) (quoting *Atlas*, 886 F.2d at 991).

The crime of wire fraud "is broad in scope and its fraudulent aspect is measured by a nontechnical standard, condemning conduct which fails to conform to standards of moral uprightness, fundamental honesty, and fair play."  *Nelson v. Nelson*, No. 14-4854, 2015 WL 4136339, at *5 (D. Minn. July 8, 2015) (quoting *Atlas*, 886 F.2d at 991).  "Because misrepresentations of fact are not necessary to the offense, it follows that no misrepresentations need be transmitted by mail or wire: even routine business communications in these media may suffice to make a scheme of false dealing into a federal offense."  *Abels,* 259 F.3d at 918.

The Court concludes that Plaintiffs have alleged the predicate acts of wire fraud with the required particularity under Rule 9(b).  First, the Complaint plausibly alleges a scheme to defraud Plaintiffs.[2]  The Complaint alleges that the Shyrock Defendants sought

---

[2] The Shyrock Defendants argue that Complaint fails to allege fraud because predictions of future success and puffery are not fraud.  (Defs.' Mem. Supp. Mot. Dismiss at 7–8.)  It is true that forward-looking statements and puffery do not constitute fraud.  *See, e.g., Teng Moua v.*

to sell Mill City before its financial collapse, and Ramsey contacted Calhoun to begin the sale process. (*Id.* ¶¶ 39–40.) Plaintiffs allege that the Shyrock Defendants made various false or misleading statements and omissions between November 2024 and February 2025, with the intent to convince Plaintiffs to purchase Mill City (*see id.* ¶ 75):

- On November 8, 2024, Calhoun Defendants provided Tam with the Calhoun report. (*Id.* ¶ 44.)

- On November 21, 2024, the Calhoun Defendants provided Tam with an inaccurate balance sheet for October 2024. (*Id.* ¶ 45.)

- On December 2, 2024, Ramsey told Tam that Christine was taking on a leadership role and that he had hired a new CRNA, even though that person only agreed to shadow a single shift. (*Id.* ¶ 47.)

- On December 4, 2024, Ramsey, Calhoun, and Moorjani refused to disclose how much the Shyrock Defendants paid to purchase Mill City from the Kingstedts. (*Id.* ¶ 48.)

---

*Jani-King of Minn., Inc.*, 810 F. Supp. 2d 882, 890 (D. Minn. 2011). However, construing the Complaint in the light most favorable to the non-movant, the Complaint plausibly alleges fraud. For example, Ramsey informed Tam that he had hired a new CRNA, when in fact, the individual had merely agreed to shadow for a single shift and never returned to work at Mill City. (Compl. ¶ 47.) Then, on December 30, 2024, Ramsey submitted a list of Mill City's independent contractors to Tam's lender—several of whom were no longer worked for company. (*Id.* ¶ 53.) Later, on January 10, 2025, Tam emailed Ramsey to ask whether Mill City had ever been involved in any lawsuits, past or present. Ramsey replied that there were none, omitting the litigation with the Kingstedts. (*Id.* ¶ 54.) Because the Complaint plausibly alleges numerous false statements, the Court declines to dismiss the RICO claim on this basis.

- On December 13, 2024, Ramsey failed to disclose the true reason for the low number of December cases. Instead, he told Tam that the reason for the low number of cases was "seasonal" and "that sometimes the future schedules for individual patients do not populate into the scheduling calendar until a week or two before the procedure." (*Id.* ¶ 49.)

- On December 17, 2024, Ramsey told Tam that he expected Mill City's SDA to come in at "just about $300k," which was false. (*Id.* ¶ 50.)

- On December 19, 2024, Ramsey responded that there were no serious financial issues when Tam asked Ramsey if there were any changes in financial conditions she needed to know about, despite there being serious financial issues. (*Id.* ¶ 51.)

- On December 26, 2024, Ramsey made false or misleading statements about Mill City's financial condition to underwriters. (*Id.* ¶ 52.)

- On December 30, 2024, Ramsey provided Tam's lender with a list of Mill City's independent contractors, which included individuals that no longer worked for Mill City or who had worked once but did not wish to return. (*Id.* ¶ 53.)

- On January 10, 2024, Ramsey stated in an email to Tam that there were no current or past lawsuits against Mill City, despite the current pending lawsuit involving the Kingstedts regarding unpaid services. (*Id.* ¶ 54.)

- On January 13, 2024, Defendant Johnson provided Plaintiffs (through their lender) with the Certified Financial Statement, which allegedly contained false financial information. (*Id.* ¶ 55.)

- In late January or early February, during a discussion about cancellations, Ramsey falsely informed Tam that cases were being rescheduled and could total as many as fifty that month. In reality, only 15 cases occurred in February. (*Id.* ¶ 57.)

The Complaint's allegations specify who made the statement, when it was made, how it was made, and what it contained—as is required under Rule 9(b). As a result of Defendants' misrepresentations, Plaintiffs signed the asset purchase agreement, and at closing, Plaintiffs' lender in Missouri issued four wire transfers, totaling more than $750,000. (*Id.* ¶¶ 56, 58.) Taken together, these acts plausibly allege a scheme to defraud Plaintiffs.

Second, the Complaint plausibly alleges that Defendants acted with an intent to defraud. By misrepresenting Mill City's financial condition and staffing levels, Defendants successfully discouraged Plaintiffs from walking away from the deal. (*See id.* ¶ 56.) In light of Defendants' actions, it is reasonable to infer that Defendants intended to defraud Plaintiffs. *Cf. United States v. Quick*, 153 F. App'x 408, 409 (8th Cir. 2005) (noting that the sequence of events and relevant circumstances may support an inference of fraudulent intent).

26

Third, Plaintiffs also plausibly allege foreseeability. Because disclosing financial information and negotiating terms are essential parts of a business sale, it is reasonably foreseeable that wire communications (such as email or telephone) would be used to negotiate the deal's terms and facilitate the transaction.

Fourth, the Complaint adequately alleges that wires were actually used to further the scheme. For instance, the Calhoun report was sent to Plaintiffs by email. (*Id.* ¶ 76.) On January 10, 2025, Tam emailed Ramsey and asked if there were any current or past lawsuits involving Mill City, and Ramsey responded that there were none. (*Id.* ¶ 54.) The Certified Financial Statement was also sent by wire. (*Id.* ¶ 66.) The Complaint also alleges that emails were exchanged between Defendants regarding the negotiations and Mill City's condition as well as telephone calls between Plaintiffs and Defendants concerning the same. (*Id.* ¶ 76.) Finally, based on the Defendants' alleged fraud, Plaintiffs' lender made a series of wire transfers to the Shyrock Defendants' and their bank, the Calhoun Defendants, and the law firm that facilitated the closing. (*Id.* ¶ 58.) In sum, the Complaint alleges that each Defendant used wires in furtherance of alleged scheme.

Accordingly, the predicate acts of wire fraud have been plausibly alleged.

### 5.    Interstate Commerce

To be liable under RICO, an enterprise must be "engaged in, or the activities of which [must] affect, interstate or foreign commerce." 18 U.S.C. § 1962(c). The Shyrock Defendants argue that the Complaint fails to allege an interstate nexus for both Counts I (RICO) and II (Wire Fraud) because Complaint only alleges intrastate communications.

27

(Defs.' Mem. Supp. Mot. Dismiss at 22–25.)   In other words, Defendants argue that Plaintiffs and Defendants reside in Minnesota, and that no communication took place outside of Minnesota.  However, the Court finds that the interstate nexus is satisfied for three reasons.

First, the Complaint plainly alleges that Plaintiffs' lender in Missouri wired funds to Defendants in Minnesota.  (Compl. ¶ 58.)  This fact alone demonstrates an interstate nexus.  *See United States v. Edelmann*, 458 F.3d 791, 812 (8th Cir. 2006) (concluding that interstate wires were used where a Schwab office in Little Rock wired money to defendant's bank account at a Little Rock bank because the government showed that funds moved through multiple states to effectuate the wire transfer).

Second, the Complaint alleges that instrumentalities of commerce were used.  In particular, Plaintiffs allege that the alleged fraud was facilitated using email and telephone.  (*See* Compl. ¶¶ 54, 66–67, 76.)  Because instrumentalities of commerce were allegedly used, the interstate nexus is satisfied.  *See United State Sec. & Exch. Comm'n v. Markusen*, No. 14-3395, 2016 WL 1629267, at *9 (D. Minn. Apr. 25, 2016) (concluding that the means-of-interstate commerce requirement of Rule 10b-5 action had been met and noting that "it is beyond debate the Internet and email are facilities or means of interstate commerce" (quotation omitted)).

Third, the allegations involve economic activity—namely, the sale of business. When the enterprise engages in economic activity, "a de minimis connection suffices for

a RICO enterprise that 'affects' interstate commerce." *United States v. Riddle*, 249 F.3d 529, 537 (6th Cir. 2001).[3] Here, the allegations plausibly allege the minimal effect required, especially in light of the allegation that the alleged fraudulent scheme resulted in four wire transfers from Plaintiffs' lender in Missouri to Minnesota-based parties.

Accordingly, the Complaint satisfies the interstate nexus requirement under both RICO and 18 U.S.C. § 1343.

### A.    COUNT II: WIRE FRAUD

The Shyrock Defendants argue that the Court should dismiss the standalone wire fraud count because the wire fraud statute (18 U.S.C. § 1343) does not confer a private right of action.  While correct, the Shyrock Defendants did not make this argument until their reply brief.  Generally, the Court does not entertain arguments made for the first time in a reply brief.  *See, e.g.*, *Louis DeGidio, Inc. v. Indus. Combustion, LLC*, No. 19-2690, 2019 WL 6894437, at *3 n.2 (D. Minn. Dec. 18, 2019).  Nonetheless, the Court will dismiss the wire fraud count with prejudice to the extent Plaintiffs raise it as a standalone cause of action because the Eighth Circuit has held that 18 U.S.C. § 1343 does not confer a

---

[3] *See also Waucaush v. United States*, 380 F.3d 251, 256 (6th Cir. 2004) ([W]here the enterprise itself did not engage in economic activity, a minimal effect on commerce will not do."); *Jefferson v. United States*, No. 97-276, 2002 WL 31748608, at *2 (D. Minn. Dec. 2, 2002) (rejecting argument that a jury instruction misstated the law by requiring only a minimal effect on interstate commerce, and reaffirming that for § 1959 violations, regarding violent crimes in aid of racketeering, only a minimal effect is required).

private cause of action. *See Wisdom*, 167 F.3d at 408. The Court's dismissal of Count II does not prevent Plaintiffs from alleging wire fraud as RICO predicate acts.

### III.    COUNTS III–XIV: STATE LAW CLAIMS

The sole basis for the Court's jurisdiction over Plaintiffs' state law claims is 28 U.S.C. § 1367(a), which permits a federal district court to exercise supplemental jurisdiction over claims that are a part of the same case or controversy as the claims that fall within the district court's original jurisdiction. The Court may decline to exercise supplemental jurisdiction over a claim if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "The district court is afforded broad discretion in determining whether to exercise supplemental jurisdiction." *Crest*, 660 F.3d at 353.

Because the Court will deny the Shyrock Defendant's motion to dismiss as to Plaintiffs' RICO claim, the Court will exercise supplemental jurisdiction over Plaintiffs' state law claims. However, if the Court dismisses Plaintiffs' RICO claim at summary judgment, it may dismiss the remaining state law claims under § 1367(c). *See Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 32 (2025) (When one of the circumstances set forth in § 1367(c) is present, "the court may (and indeed, ordinarily should) kick the case to state court.").

### CONCLUSION

The Court will deny the Shyrock Defendants' motion to dismiss under Federal Rules of Civil Procedure 9(b) and 12(b)(6) as to Plaintiffs' RICO claim (Count I) but will grant the

30

motion as to Plaintiffs' civil wire fraud claim (Count II). Because the Court will not dismiss Plaintiffs' RICO claim, the Court will exercise supplemental jurisdiction over Plaintiffs' remaining state law claims (Counts III–XIV).

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants Clarence William Ramsey III and Shyrock MCA Holding, LLC's Motion to Dismiss [Docket No. 14] is **GRANTED in part** and **DENIED in part**, as follows:

1. Count I: RICO Violation — Motion to Dismiss is **DENIED**;

2. Count II: Wire Fraud — Motion to Dismiss is **GRANTED**, and Count II is **DISMISSED with prejudice**; and

3. Counts III–XIV: State Law Claims — Motion to Dismiss is **DENIED**.

DATED:  January 13, 2026
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge

31